# EXHIBIT A

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


KARIN DUDZIENSKI,

     Plaintiff;

    vs.                  No. 07 CV 3813

BCBG MAX AZRIA GROUP, INC., a
California corporation,
individually, and d/b/a BCBG
MAX AZRIA; BCBG MAX AZRIA
HOLDINGS, INC., a California
corporation, individually, and
d/b/a BCBG MAX AZRIA; BCBG MAX
AZRIA INTERNATIONAL HOLDINGS,
INC., a California corporation
individually, and d/b/a BCBG
MAX AZRIA; and DOES 1-10,

     Defendants.




     The deposition of AJIT PATEL, taken before Gina

Nunes, a Certified Shorthand Reporter and Notary Public

within and for the County of Cook and State of Illinois,

at One South Wacker Drive, 28th floor, Chicago, Illinois,

on the 9th day of November 2007, commencing at the hour

of 9:35 a.m., pursuant to notice.

6b1ab0eb-14f9-4001-bea1-eb319b8be324

DEPOSITION OF AJIT PATEL - November 9, 2007

**Page 2**

APPEARANCES:

ZIMMERMAN LAW OFFICES, P.C., by
MR. HUGH J. GREEN,
100 W. Monroe Street, Suite 1300
Chicago, Illinois, 60603
(312) 440-0020,
on behalf of the plaintiff;

CALL, JENSEN & FERRELL, P.C., by
MR. SCOT D. WILSON,
610 Newport Center Drive,
Suite 700
Newport Beach, CA, 92660
(949) 717-3000,
on behalf of the defendants.

**Page 3**

1    DEPOSITION OF AJIT PATEL
2         NOVEMBER 11, 2007
3         MR. GREEN: Swear in
4    the deponent, please.
5         AJIT PATEL, called as a
6    witness herein, having been first duly
7    sworn, was examined and testified as
8    follows:
9         MR. GREEN: For the
10   record this deposition is being taken
11   pursuant to notice and will be taken
12   according to the Federal Rules of
13   Civil Procedure and the local rules
14   of the Northern District of Illinois.
15   EXAMINATION
16   BY MR. GREEN:
17   Q.  Good morning, sir.
18   A.  Good morning.
19   Q.  Could you please state your
20   name and spell your last name,
21   please.
22   A.  Ajit Patel, P-A-T-E-L.
23   Q.  Mr. Patel, for the record,
24   my name is Hugh Green and I represent

**Page 4**

1    Karen Dudzienski versus several BCBG
2    entities.
3         Are you aware of that,
4    sir?
5    A.  Yes, I do.
6    Q.  Before we begin, have you
7    given a deposition before?
8    A.  Yes, I have.
9    Q.  On approximately how many
10   occasions?
11   A.  Couple.
12   Q.  We are just to go over some
13   ground rules before we begin.  As you
14   may be familiar, the court reporter
15   is taking everything down that we say
16   so it's important for us, for our
17   responses, to be oral so I'd ask you
18   to refrain from nods of the head or
19   um-hums, which the reporter can't
20   take.  So please be aware of that.
21        Also, if we could
22   refrain from talking over one another
23   because obviously the reporter can
24   only take one person at a time.

**Page 5**

1         The other issue, if
2    there is a question that I ask you
3    that is confusing or you don't
4    understand, please let me know and I
5    will ask it another way.
6         I guess -- also, I see
7    you have some water in front of you.
8    If you need to take a break, please
9    let me know.  We can take as many
10   breaks as you need.
11        Are you prepared to
12   answer my questions today?
13   A.  Yes, I am.
14   Q.  Is there any reason why you
15   wouldn't be able to give full and
16   complete and truthful answers to my
17   questions today?
18   A.  No.
19   Q.  I will be referring to a
20   statute, and that statute is the Fair
21   and Accurate Credit Transactions Act.
22   Are you familiar with that statute?
23   A.  I've heard of it, yes.
24   Q.  If I refer to it as FACTA,

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 6

1 is it okay as a shorthand term for
2 referring to that statute?
3    A.  Yes.
4    Q.  Could you just tell me, sir,
5 your -- give me a brief background of
6 your educational history.
7    A.  I went to UCLA back in from
8 '71 to '76 and studied nuclear
9 engineering there, and subsequent to
10 that, about ten years later from
11 that, I went to Pepperdine University
12 and received M.B.A. there.
13    Q.  And so your undergrad degree
14 is from UCLA?
15    A.  I did not complete a degree
16 there but I studied -- I was there
17 for six years doing my undergraduate
18 and graduate work but never completed
19 it yet.
20    Q.  And your graduate degree --
21 you have one graduate degree from
22 Pepperdine?
23    A.  Pepperdine is my executive
24 M.B.A., was a night program that I

Page 7

1 did.
2    Q.  Can you tell me what jobs
3 you've held after high school.
4    A.  After high school.
5    Q.  Yes.
6        MR. WILSON:  Counsel,
7 I'm just going to very briefly -- I'm
8 not going to object.  I will give
9 you some latitude, but I just want to
10 clarify that Mr. Patel is being made
11 available for deposition pursuant to
12 Rule 30B6 as the person most
13 qualified to testify on behalf of the
14 defendants in this case regarding, as
15 you know, pursuant to the Court's
16 October 29th ruling, the location of
17 the witnesses, both party affiliated
18 and nonparty affiliated.
19        We will get into
20 background but I just want to make
21 sure that it's clear between the
22 parties that this is not a global PMQ
23 deposition regarding all topics, so I
24 will let you get into background and

Page 8

1 I think that's fair.  I understand
2 that probably a little bit of this is
3 just foundational.
4        MR. GREEN:  Sure.
5        MR. WILSON:  But I just
6 wanted to clarify that very quickly.
7        MR. GREEN:  Understood.
8 And I thank you for the
9 clarification.
10   BY MR. GREEN:
11    Q.  Okay.  I guess, for my
12 benefit, could you tell me what your
13 title is now.
14    A.  I am currently Chief
15 Information Officer for BCBG.
16    Q.  And how long have you had
17 that position?
18    A.  18 months.
19    Q.  And what did you do prior
20 to that?
21    A.  I was achieve -- well, for
22 two years I was retired, and then
23 prior to that I was Chief Information
24 Officer at Chico's.

Page 9

1    Q.  And what is Chico's, sir?
2    A.  It is an apparel company,
3 retailer.
4    Q.  Can you tell me what your
5 job duties are as a Chief Information
6 Officer.
7        MR. WILSON:  At Chico's
8 or at BCBG?
9   BY MR. GREEN:
10    Q.  At BCBG what are your job
11 duties?
12    A.  I have a lot of
13 responsibilities.  However, in brief,
14 it is I deploy, manage, support
15 information -- electronic information
16 systems.
17    Q.  And what does -- can you
18 give me a thumbnail sketch of what it
19 means to deploy, manage and support
20 information systems?
21    A.  I select information
22 systems, computer systems, hardware
23 and software, and I implement those
24 systems throughout the company where

DEPOSITION OF AJIT PATEL – November 9, 2007

Page 10

1  necessary where it's required, and
2  then I support those systems that we
3  deploy, or the systems that are
4  already in place today, I support
5  them, manage them, maintain them,
6  through my department.
7      Q.  What kind of systems do you
8  deploy?
9      A.  Lots of systems, which means
10  accounting systems, point of sale
11  systems, merchandise management
12  systems, distribution center systems,
13  apparel design development systems,
14  and a lot more.
15      Q.  Are you also in charge of
16  implementing -- strike that.
17          Are you also in charge
18  of acquiring the hardware for those
19  systems?
20      A.  Yes, I am.
21      Q.  And are you employed
22  directly by BCBG?
23          MR. WILSON:  Vague.
24      BY MR. GREEN:

Page 11

1      Q.  Who is your employer?
2      A.  My employer is BCBG Max
3  Azria Group.
4      Q.  Are you employed at all by
5  Max Rave?
6          MR. WILSON:  Objection
7  to the extent the question calls for
8  legal conclusion.  It's fair as to
9  what his understanding of who his
10  employer is, but to ask whether he
11  knows of the specific legal entity
12  that employs him may call for a legal
13  conclusion, but you can answer the
14  question.
15          THE WITNESS:  I
16  actually am employed by BCBG Max
17  Azria Group; and BCBG Max Azria Group
18  may own as a division Max Rave, but
19  I am employed by BCBG Max Azria
20  Group.
21      Q.  All right.  And in terms of
22  are you a -- by your title are you
23  an officer of the company -- of BCBG,
24  excuse me.  Are you an officer of

Page 12

1  BCBG?
2      A.  Yes, I am.
3      Q.  And can you name the other
4  officers of BCBG?
5      A.  Brian Fleming.
6      Q.  Can you spell that last
7  name, please.
8      A.  F-L-E-M-I-N-G.
9      Q.  And who is he?
10      A.  He's the Chief Financial
11  Officer.  And Ben Malka, M-A-L-K-A,
12  and he is the president.
13      Q.  Any other officers of BCBG?
14      A.  Max Azria.
15          MR. WILSON:  And
16  counsel, when you refer to BCBG,
17  you're referring to BCBG Max Azria
18  Group, Incorporated?
19          MR. WILSON:  Yes.
20      BY MR. GREEN:
21      Q.  That is your employer.
22      A.  That is correct.
23      Q.  So just for the record, when
24  I refer to BCBG, I mean BCBG Max

Page 13

1  Azria Group, Incorporated.  Okay?
2      A.  I understand.
3      Q.  Thank you.  And besides
4  those officers, are there any other
5  officers of BCBG?
6      A.  Not that I know of.
7      Q.  Are there any other -- do
8  you know of any officers -- strike
9  that.
10          What did you do to
11  prepare for your deposition today?
12      A.  I didn't prepare for it.
13  All I did was had read everything
14  that I had read and recall that was
15  submitted to you on this hearing but
16  through our legal counsels.
17      Q.  And what did you read?
18      A.  The things that I have said.
19  The documents I had signed that was
20  given to me that were prepared by our
21  legal counsel.
22      Q.  And what documents were
23  those?
24      A.  The interrogatories in my --

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 14

1  the interrogatories -- and I don't
2  exactly know the names of the
3  documents themselves, but there were
4  three or four documents that I
5  signed.
6      Q.  Okay.  Who do you report
7  within BCBG?  Who do you report to?
8      A.  I report to the Chief
9  Financial Officer.
10     Q.  Brian Fleming.
11     A.  That is correct.
12     Q.  And who does Brian Fleming
13 report to?
14     A.  I believe he reports to Max
15 Azria.
16     Q.  With respect to BCBG Max
17 Azria, do you know how many stores
18 they have in the United States?
19     A.  Not exactly.  Not exact
20 number.  But approximately 200 plus
21 stores of BCBG Max Azria and
22 approximately 400 plus stores of Max
23 Rave.
24     Q.  And how many BCBG stores are

Page 15

1  there in Illinois, do you know, if
2  you know?
3      A.  I'm sorry, I don't know.
4      Q.  Could you give me an
5  organizational overview of BCBG in the
6  United States.  And specifically I'm
7  asking are there regional offices for
8  BCBG stores?
9          MR. WILSON:  Vague.
10 Lacks foundation.  Calls for
11 speculation.  You can answer the
12 question.
13     BY MR. GREEN:
14     Q.  You can answer if you
15 understand.
16     A.  No, we don't have any other
17 offices outside of Los Angeles except
18 for sales offices that we have for
19 our wholesale division in New York.
20     Q.  And where is BCBG's
21 headquarters?
22     A.  In Vernon, California.
23     Q.  And the office you
24 identified in New York is what?

Page 16

1      A.  It is a sales office for
2  our wholesale division.
3      Q.  And what do they do in New
4  York?
5          MR. WILSON:  If you
6  know.
7          THE WITNESS:  I don't
8  exactly know what they do but I
9  believe they sell to Macy's and so
10 forth.  They are retailers.
11     BY MR. GREEN:
12     Q.  Are there any regional
13 managers that oversee groups of BCBG
14 stores in the U.S.?
15     A.  Oversee from what capacity,
16 may I ask?
17     Q.  In other words, throughout
18 the nation are stores grouped in
19 certain regions where there would be
20 a supervising manager that would
21 oversee other stores in an area?  If
22 you don't understand, I can ask in
23 another way.
24     A.  So far as I understand, we

Page 17

1  have district managers and regional
2  managers that oversee the operations
3  of the stores.
4      Q.  And is there a district
5  manager that oversees Illinois?
6          MR. WILSON:  Calls for
7  speculation, lacks foundation.
8          THE WITNESS:  I am
9  assuming that there is.
10     BY MR. GREEN:
11     Q.  Is there a regional manager
12 that oversees BCBG stores in Illinois?
13         MR. WILSON:  Same
14 objections, but if you know, you can
15 answer.
16         THE WITNESS:  Likewise,
17 I am assuming that there is.
18     BY MR. GREEN:
19     Q.  But you don't know.
20     A.  I couldn't say I absolutely
21 know but I would have to say yes,
22 there would be a regional manager
23 because every store has a district
24 manager and a regional manager.

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 18

1    Q. Do you know any district
2  manager within BCBG throughout the
3  United States?
4    A. No, I don't.
5    Q. Do you know any regional
6  manager of BCBG throughout the United
7  States?
8    A. No, I don't.
9    Q. Do you know if the BCBG
10  stores are franchises, the individual
11  BCBG stores, are they franchises?
12            MR. WILSON: Objection
13  to the extent the question calls for
14  legal conclusion, but you can answer
15  as to your understanding.
16            THE WITNESS: I don't
17  believe there are any franchises.
18  They're not.
19  BY MR. GREEN:
20    Q. So are they independently
21  owned?
22            MR. WILSON: Same
23  objections. You can answer.
24            THE WITNESS: That is

Page 19

1  correct.
2  BY MR. GREEN:
3    Q. I'd like to talk to you
4  about credit card processing and debit
5  card processing. Are you familiar
6  with the process -- are you familiar
7  with the procedures that BCBG uses to
8  process debit cards and credit cards?
9    A. Yes.
10    Q. And can you tell me to the
11  extent that you know how BCBG
12  processes credit cards and debit
13  cards?
14            MR. WILSON: Overbroad.
15  Lacks foundation. It's vague and
16  ambiguous.
17            And just to clarify and
18  without getting into a speaking
19  objection, the vagueness in your
20  question lies in whether you're
21  talking about point of sale or from
22  an infrastructure perspective and the
23  types of roles and responsibilities
24  that someone like Mr. Patel and his

Page 20

1  team would have responsibility for
2  overseeing.
3            But with that, I will
4  let Mr. -- Mr. Patel, you can
5  obviously answer the question to the
6  extent you understand it.
7            THE WITNESS: Details
8  of processing I do not.
9  BY MR. GREEN:
10    Q. What do you mean "details of
11  processing"?
12    A. If you ask me exactly how
13  somebody scans a card, for example,
14  if there is a scanner or if -- how
15  somebody collects that information,
16  specifically how it's collected and
17  sent out to other places for approval
18  or whatever it might be, process
19  involved, no, I don't know.
20    Q. So do you know what hardware
21  is in a specific BCBG store to
22  collect credit card or debit card
23  receipts?
24            MR. WILSON: Objection.

Page 21

1  It's beyond the scope of the narrow
2  purpose for which the witness has
3  been designated as a Rule 30B6
4  witness.
5            Mr. Patel, you can
6  answer the question but mindful of
7  the fact that Mr. Patel's response
8  would be in his individual capacity
9  and not as a person most qualified
10  Rule 30B6 witness speaking on behalf
11  of any BCBG entity.
12            THE WITNESS: There is
13  a lot of hardware in our stores
14  acquired over a long period of time
15  so, no, I don't know exactly what
16  hardware is at any place, nor do I
17  know which hardware is purchased at
18  any particular time to deploy at each
19  other's stores right now.
20  BY MR. GREEN:
21    Q. Same question with regards
22  to the software that's used in BCBG
23  stores. Are you responsible for
24  acquiring that software?

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 22

```
 1           MR. WILSON:  Same
 2   objections but you can respond.
 3           THE WITNESS:  I will
 4   clarify that I am responsible from a
 5   very high level what software happens
 6   to be there in terms of supporting
 7   and maintaining it, meaning my
 8   department is responsible, not me
 9   personally, but I have a vague idea
10   of what software is deployed at each
11   of the locations -- or throughout the
12   company.
13     BY MR. GREEN:
14     Q.  So it's possible there is
15   different software at different BCBG
16   stores.
17           MR. WILSON:  Objection.
18   Calls for speculation.  It lacks
19   foundation.  It's overbroad and it
20   misstates the witness' prior
21   testimony.  You can answer.
22           THE WITNESS:  There is
23   different software at different
24   stores.
```

Page 23

```
 1     BY MR. GREEN:
 2     Q.  Is there different hardware
 3   at different stores?
 4           MR. WILSON:  Same
 5   objections.
 6           THE WITNESS:  Yes.
 7     BY MR. GREEN:
 8     Q.  And just for clarification,
 9   you are unaware of any specific
10   hardware at any of the stores.
11           MR. WILSON:  Misstates
12   prior testimony.
13           THE WITNESS:  I may be
14   aware of a store or two where I may
15   have been involved because I was
16   there possibly but, no, I do not know
17   what specific hardware or software is
18   at each particular store.
19           MR. GREEN:  Okay I'd
20   like you to mark this as Plaintiff's
21   Exhibit 1.
22           (Whereupon Plaintiff's
23   Exhibit No. 1 was marked for
24   identification.)
```

Page 24

```
 1     BY MR. GREEN:
 2     Q.  What I'm handing to your
 3   attorney is Plaintiff's Exhibit 1.
 4   If you could please look at that,
 5   sir, and when you have a chance to
 6   read it, could you please look up so
 7   I know you're --
 8     A.  Am I looking at two
 9   different documents or one document?
10     Q.  I don't know what your
11   attorney handed you.  They're the same
12   document?
13           MR. WILSON:  I handed
14   Mr. Patel the document which has been
15   identified and attached as Exhibit 1
16   to Mr. Patel's deposition.  So Mr.
17   Patel, you're looking at two copies
18   of the same document.
19           THE WITNESS:  Okay.
20   Okay.
21     BY MR. GREEN:
22     Q.  Are you familiar with that
23   document, sir?
24     A.  Yes, I am.
```

Page 25

```
 1     Q.  And what is that document?
 2     A.  That document is my
 3   declaration in support of our motion
 4   to transfer venue.
 5     Q.  Can you please look at page
 6   5 of that document.
 7     A.  Okay.
 8     Q.  Is that your signature, sir?
 9     A.  That is correct.
10     Q.  What I'd like to do, Mr.
11   Patel, is to go through this document
12   and ask you questions about it.  I
13   point your attention to paragraph 2
14   on page 1 and it says, "As a result
15   of my employment, I am familiar with
16   the various aspects of BCBG's business
17   and the operations of each member of
18   the BCBG family of companies'
19   operations, including knowledge about
20   credit card and debit card processing,
21   transactions and other information
22   technology issues."
23           Did I read that
24   correctly, sir?
```

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 26

1    A.  You did.
2    Q.  And can you please tell me
3    what the BCBG family of companies is?
4           MR. WILSON:  Objection
5    to the extent the question calls for
6    a legal conclusion.
7           Mr. Patel, you can
8    answer as to what your understanding
9    of the BCBG family of companies is,
10   but.
11          MR. GREEN:  You know,
12   counsel, I appreciate -- can you
13   please make the objection.  He wrote
14   it here in his declaration and I'm
15   asking --
16          MR. WILSON:  Fair
17   enough, counsel.  I'm not instructing
18   the witness not to answer.
19          MR. GREEN:  I
20   understand.  But I want to know what
21   it means.
22   BY MR. GREEN:
23   Q.  So with that, what is BCBG
24   family of companies?

Page 27

1           MR. WILSON:  Same
2    objection.
3           You can answer.
4           THE WITNESS:  BCBG Max
5    Azria owns a number -- or owns as
6    divisions a number of companies
7    including, for example, Max Rave,
8    companies in Europe, Don Algodo,
9    companies in Asia.  So it's a number
10   of companies that BCBG Max Azria owns
11   and that is the family of companies
12   that we refer to.
13   BY MR. GREEN:
14   Q.  What do you mean by -- what
15   knowledge do you have of credit card
16   and debit card processing, Mr. Patel?
17   A.  In the process of a
18   transaction, when the customer walks
19   in, we process a transaction by -- if
20   a customer presents a credit card
21   with which the customer wishes to pay
22   for the purchases that he/she makes,
23   we accept the credit card, the credit
24   card is swiped and/or entered,

Page 28

1    possibly sometimes into the register.
2           It is then -- the
3    register then processes that card for,
4    A, possibly validity and/or for
5    approval of that card through certain
6    organizations that do clearance of the
7    credit card.  And once the approval
8    is received, the salesperson will ring
9    up the sale as such.
10   Q.  What credit cards does BCBG
11   accept?
12   A.  We accept American Express,
13   Master Card, Visa.
14   Q.  Any others?
15   A.  Possibly Discover.
16   Q.  Do the stores in Illinois
17   accept those credit cards?
18   A.  I believe so.
19   Q.  How does BCBG -- strike
20   that.
21          Is there an agreement
22   between BCBG and the credit card
23   companies to use credit cards?
24          MR. WILSON:  Objection.

Page 29

1    It's overbroad, calls for speculation,
2    lacks foundation, potentially calls
3    for legal conclusion, and most
4    importantly, it's far outside the
5    scope of the Rule 30B6 deposition for
6    which we're here today.
7           Mr. Patel, you can
8    answer the question to the extent you
9    know, mindful of that being your
10   individual capacity as you've not been
11   designated as a 30B6 witness
12   testifying today with regard to that
13   subject.
14          THE WITNESS:  I am not
15   aware of any agreements personally.
16   BY MR. GREEN:
17   Q.  Okay.  Can you please draw
18   your attention to paragraph 3 of your
19   declaration.  Do you know -- it says,
20   "BCBG family of companies includes:
21   BCBG Max Azria Group, Inc., which is
22   a California corporation; BCBG Max
23   Azria Holdings, Inc., also a
24   California corporation; BCBG Max Azria

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 30

1  International Holdings, Inc., a
2  California corporation; and Max Rave,
3  LLC, a Delaware limited liability
4  company with its principal place of
5  business in Vernon, California"?
6      Did I read that
7  correctly, sir?
8      A.  Yes, you did.
9      Q.  Can you tell me what BCBG
10  Max Azria's Holdings, Inc.'s primary
11  business is?
12      MR. WILSON:  Vague.
13  Calls for speculation.
14      THE WITNESS:  I
15  honestly don't know.
16  BY MR. GREEN:
17      Q.  Do you know what primary
18  business BCBG Max Azria International
19  Holdings, Inc. does?
20      MR. WILSON:  Same
21  objections.
22      THE WITNESS:  And the
23  same answer.
24  BY MR. GREEN:

Page 31

1      Q.  Okay.  Do you know any of
2  the officers of BCBG Max Azria
3  Holdings, Inc.?
4      A.  Truthfully, no.
5      Q.  Do you know if there are
6  officers of that company?
7      A.  I don't know.
8      Q.  The next question is do you
9  know any officers of BCBG Max Azria
10  International Holdings, Inc.?
11      A.  I don't.
12      Q.  Do you know any members or
13  directors of Max Rave, LLC?
14      A.  I don't.
15      Q.  How is BCBG Max Azria Group,
16  Inc. related to Max Rave, LLC?
17      MR. WILSON:  Objection.
18  Calls for a legal conclusion.
19      THE WITNESS:  I don't
20  know the relationship, direct
21  relationship.
22  BY MR. GREEN:
23      Q.  Can I draw your attention to
24  paragraph 7.  It says, "Acquired in

Page 32

1  2006, Max Rave is a wholly owned
2  subsidiary of BCBG."
3      Did I read that
4  correctly?
5      A.  You did.
6      Q.  Can you tell me what you
7  meant by that.
8      A.  That it was acquired -- the
9  company acquired Max Rave --
10      Q.  I'm sorry.  Which company?
11      A.  BCBG.
12      Q.  BCBG Max Azria Group?
13      A.  Max Azria Group is what my
14  understanding is, yes.
15      Q.  Okay.  Can I draw your
16  attention to paragraph 5.  "The
17  headquarters for all of the BCBG
18  family of companies, including BCBG
19  and Max Rave, is located at 2761
20  Fruitland Avenue, Vernon, California,
21  90058.  All the senior officers and
22  senior employees for BCBG and Max
23  Rave work out of the California
24  headquarters."

Page 33

1      Did I read that
2  correctly?
3      A.  You did.
4      Q.  And who are the senior
5  officers that work at BCBG and Max
6  Rave?
7      MR. WILSON:  That
8  you're referring to in the paragraph.
9  BY MR. GREEN:
10      Q.  Yes.  That you're referring
11  to in the paragraph.
12      A.  Those officers that I know
13  of that work out of there are Max
14  Azria himself, Ben Malka himself.
15      Q.  Could you spell that.
16      A.  Ben Malka, M-A-L-K-A.
17      Q.  Okay.
18      A.  Brian Fleming.  I think
19  those are the people that I know who
20  may be the officers of these
21  companies.
22      Q.  And where does Max Azria
23  live, if you know?
24      A.  I only know that he lives

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 34

1    in Los Angeles someplace.
2        Q. Ben Malka, do you know where
3    he lives?
4        A. Same. He lives in Los
5    Angeles someplace.
6        Q. Brian Fleming, do you know
7    where he lives?
8        A. Same answer.
9        Q. Do you consider yourself a
10   senior officer of BCBG and Max Rave?
11       A. I would not consider myself
12   a senior officer of Max Rave -- is
13   it BCBG or Max Rave?
14       Q. Do you consider yourself a
15   senior officer of BCBG?
16       A. I am an officer of BCBG. I
17   don't consider myself among the senior
18   officers of BCBG.
19       Q. Okay. Do you consider
20   yourself an officer of Max Rave?
21       A. No, I don't consider myself
22   an officer of Max Rave.
23       Q. And I'm sorry if I asked
24   this before.

Page 35

1            Where do you live?
2        A. I live in Los Angeles.
3        Q. And if we could jump down
4    to paragraph 8, it says, "As with all
5    members of the BCBG family of
6    companies, although Max Rave is a
7    separate legal entity, BCBG and Max
8    Rave employees constantly work
9    together on a daily basis on various
10   projects and tasks, which include
11   bringing all BCBG and Max Rave stores
12   into compliance with the requirements
13   of FACTA."
14           Can you tell me what
15   efforts were used to bring the BCBG
16   stores into compliance with FACTA
17   according to that paragraph?
18           MR. WILSON: Overbroad.
19           THE WITNESS: We
20   evaluate -- well, strike that. I was
21   calling for myself. We went through
22   the process identifying what needed to
23   be done in order to make the system
24   FACTA compliant and hired a company

Page 36

1    that was a vendor of the software to
2    rewrite the software and modify the
3    software in order to make it
4    compliant.
5        BY MR. GREEN:
6        Q. When you say "we," sir, what
7    do you mean?
8        A. All of the employees what
9    I'm referring to in paragraph 8,
10   which is my staff and the company,
11   the rest of the company.
12       Q. And who would be part of
13   your staff? Can you name some of
14   the individuals that are part of your
15   staff.
16       A. Sure. At the time this was
17   going on, I would say a gentleman by
18   the name of Joe Hasenzahl,
19   H-A-S-E-N-Z-A-H-L; Steve Suarez; Bill
20   Lucas; Ahamed Nehoray, N-E-H-O-R-A-Y;
21   and a number of other people. There's
22   a lot. I have a big team.
23       Q. Approximately how many
24   people on your team?

Page 37

1            MR. WILSON: Counsel,
2    when you say "team," do you mean
3    working directly or indirectly under
4    Mr. Patel or do you mean directly or
5    indirectly involved in BCBG and Max
6    Rave's efforts to bring their credit
7    and debit card processing machines
8    into compliance with FACTA?
9            MR. GREEN: His word
10   "team."
11           BY MR. GREEN:
12       Q. Your word team.
13       A. My team consists of people
14   here, people -- meaning in Los
15   Angeles, in New York, in Europe, in
16   Hong Kong. That team that I referred
17   to, of course, involves all the
18   systems. The team for my retail
19   systems, some of those people are
20   involved in the retail systems, others
21   are not, and that team involved many
22   of them that I have listed here.
23       Q. And let's go through this.
24   Joel Hasenzahl.

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 38

1    A.  Joe Hasenzahl.
2    Q.  Beg your pardon.  Where does
3  he live?
4    A.  Joe Hasenzahl is no longer
5  an employee of BCBG.
6    Q.  Okay.
7    A.  But resides in Los Angeles.
8    Q.  And where does Steve Suarez
9  live?
10   A.  Steve Suarez also resides in
11  Los Angeles.
12   Q.  Is he still an employee of
13  BCBG?
14   A.  I'm sorry, no, he's not.
15   Q.  Bill Lucas, do you know
16  where he lives?
17   A.  He lives in Los Angeles as
18  well.
19   Q.  Is he also an employee of
20  BCBG?
21   A.  No.  He no longer is.
22   Q.  And Ilhamid --
23   A.  Oh, Ahamed?
24   Q.  Yes.  I beg your pardon.

Page 39

1  Is he with the company?
2    A.  He is with the company.
3    Q.  Where does he live?
4    A.  He resides in Los Angeles as
5  well.
6    Q.  You mentioned a moment ago
7  about people in New York.  Did they
8  participate in helping -- strike that.
9         Did they -- were they
10  part of your team to bring BCBG in
11  compliance with FACTA?
12   A.  Yes.
13   Q.  And what members of your New
14  York team -- can you name the members
15  of your New York team?
16   A.  Sam Busceti, B-U-S-C-E-T-I.
17   Q.  Anyone else?
18   A.  I think those are the ones
19  that come immediately to mind.
20   Q.  So just him.
21   A.  Him, and I believe he may
22  have people that he may have used in
23  the process of making the system
24  compliant.

Page 40

1    Q.  Are there any people in
2  Europe that helped BCBG come into
3  compliance with FACTA here in the
4  States?
5    A.  No.
6    Q.  Is there anyone in Hong Kong
7  that would have helped BCBG come in
8  compliance with FACTA here in the
9  United States?
10   A.  No.
11   Q.  A moment ago you talked
12  about a vendor who helped rewrite the
13  software.  Who was that vendor, sir?
14   A.  Vendor was Triversity.
15   Q.  And what is Triversity?
16   A.  Triversity is the vendor of
17  our point of sale software.
18   Q.  And can you tell me what a
19  point of sale software is.
20   A.  Point of sale software runs
21  on a register at a store which is
22  used for processing transactions at
23  the store.
24   Q.  And were you responsible for

Page 41

1  hiring -- strike that.
2         Were you responsible
3  for involving Triversity in your
4  efforts to become -- for BCBG to
5  become compliant with FACTA?
6    A.  Among the number of people
7  that were involved, yes, I was.
8    Q.  And where is -- do you know
9  where Triversity is located?
10   A.  No, I -- they were acquired
11  by another company, SAP.  I'm not
12  sure where they're located at this
13  point, whether they have been moved
14  into their offices, so I don't know
15  where they are located right now.
16  Apologize.
17   Q.  Sure.  But to your
18  knowledge, they're not California --
19  they're not a California corporation?
20         MR. WILSON:  Calls for
21  speculation.  Lacks foundation.  Asked
22  and answered.
23         THE WITNESS:  I don't
24  know.

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 42

1    BY MR. GREEN:
2    Q.   Do you know the individuals
3    that you worked with from Triversity?
4         MR. WILSON:  When you
5    say "you," counsel, are you referring
6    to Mr. Patel personally or in his
7    representative capacity?
8    BY MR. GREEN:
9    Q.   As part of your team do you
10   know any individual from Triversity
11   that helped BCBG become compliant with
12   FACTA?
13   A.   Yes.
14   Q.   And who would those -- who
15   are those individuals?
16   A.   A gentleman by the name of
17   Greg Slepian, S-L-E-P-I-A-N; and a
18   lady by the name of Julie Lee.
19   Q.   Could you spell that last
20   name, sir.
21   A.   L-E-E.
22   Q.   And do you know where they
23   live?  Excuse me.  Do you know where
24   Greg Slepian lives?

Page 43

1    A.   He lives in Arizona.
2    Q.   Do you know where Julie Lee
3    lives?
4    A.   She lives in Los Angeles.
5    Q.   Are there any other vendors,
6    third-party vendors, that you worked
7    with in order to bring BCBG in
8    compliance with FACTA?
9    A.   We worked with a company
10   called NSB.
11   Q.   And is it NSB Retail
12   Systems, PLC?
13   A.   That's correct.
14   Q.   What did they do -- excuse
15   me.  What did NSB do to help from
16   your efforts to comply with FACTA,
17   your team's efforts, excuse me, to
18   comply with FACTA?
19   A.   The same thing that
20   Triversity did, which is modify the
21   software to comply.
22   Q.   And what did they do to the
23   software to comply?
24        MR. WILSON:  Calls for

Page 44

1    speculation.  Lacks foundation.
2    Overbroad.  Potentially calls for an
3    expert opinion.
4         THE WITNESS:  They made
5    the modifications that were called
6    for.
7    BY MR. GREEN:
8    Q.   And what was called for?
9         MR. WILSON:  Same
10   objections.  Beyond the scope of the
11   deposition.
12        THE WITNESS:  I did not
13   personally participate in that -- what
14   was called for, because I had several
15   team members that involved themselves
16   with them to make it compliant, so I
17   don't exactly know what was exactly
18   called of them to do.  No.  I
19   personally am not aware of exactly
20   what they were asked to do.
21   BY MR. GREEN:
22   Q.   Do you know what Triversity
23   was asked to do with respect to the
24   software?

Page 45

1         MR. WILSON:  Same
2    objections.
3         THE WITNESS:  Same
4    thing.  I don't personally -- I
5    personally did not instruct them.  I
6    have technical people who work with
7    them to instruct them to do what they
8    thought needed to be done in order to
9    make this compliant.
10   BY MR. GREEN:
11   Q.   Did you give your approval
12   for NSB to be part of the team to
13   bring BCBG in compliance with FACTA?
14   A.   Yes, I did.
15   Q.   But you don't know what they
16   did.
17   A.   Not to the extent what
18   programming effort, what exact code
19   changes might have been made, no, I
20   don't.  I wasn't aware of that.
21   Q.   And I apologize if I asked
22   this, but you approved of Triversity
23   to become part of a team to help
24   BCBG become compliant with FACTA.

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 46

1    A.  As a vendor, yes.
2    Q.  But you don't know what they
3  did.
4    A.  No, I don't.
5         MR. WILSON:  Just as a
6  belated objection, the question is
7  vague, it lacks foundation, it's
8  overbroad. It misstates the witness'
9  prior testimony.
10         Another thing, counsel,
11  I want to make sure -- and I think
12  I'm doing a good job of giving you
13  latitude because I want all of the
14  evidence to come before the Court on
15  the 15th; but I think it's important
16  that we not abuse this process and
17  this very limited Rule 30B6 deposition
18  and get into matters for which the
19  witness has not been designated as a
20  Rule 30B6 witness and that don't
21  relate at all to the location of the
22  witnesses, either party affiliated or
23  nonparty affiliated, and I think some
24  of your questions are treading beyond

Page 47

1  that scope.
2         MR. GREEN:  Well,
3  counsel, I appreciate your lecture on
4  the rules.  However, these are
5  questions related to Mr. Patel's
6  declaration.  He's made certain
7  statements --
8         MR. WILSON:  Counsel,
9  there's no need to get upset.  I
10  just want to --
11         MR. GREEN:  I want you
12  to know that this is what your client
13  has laid out in the declaration and
14  I'm asking the followup questions.
15         MR. WILSON:  I know.
16  And I haven't instructed the witness
17  not to answer.  I want to make sure
18  that we streamline the process, we
19  make it efficient, that we both
20  comply with the letter and spirit of
21  Judge Shadur's order.
22         MR. GREEN:  I'm well
23  aware of the order, sir, which is
24  right here.

Page 48

1         MR. WILSON:  Counsel,
2  there's no need to get upset.
3         MR. GREEN:  This isn't
4  upset.  This is about your client's
5  declaration.  I appreciate your
6  latitude for what it's worth.  Can we
7  continue?
8         MR. WILSON:
9  Absolutely.
10    BY MR. GREEN:
11    Q.  Where is NSB located, sir?
12    A.  In Montreal, Canada.
13    Q.  Can you name any of the
14  individuals who were part of the
15  team from NSB?
16         MR. WILSON:  Vague,
17  ambiguous, lacks foundation.  You
18  could answer, Mr. Patel.
19    BY MR. GREEN:
20    Q.  Maybe I could ask it another
21  way.  What individuals from NSB
22  worked with your team?
23    A.  I'm not aware of who
24  specifically worked from the NSB team

Page 49

1  on my -- on the project.  As I
2  indicated to you before, I have
3  several layers of people that work
4  for me who worked with NSB to make
5  the system compliant. Personally, I
6  did not even get into any
7  negotiations with them on this issue.
8    BY MR. GREEN:
9    Q.  But it's fair to say that
10  this Canadian company helped --
11  participated in bringing BCBG in
12  compliance with FACTA.
13         MR. WILSON:  Overbroad.
14  Argumentative. Lacks foundation.
15  It's vague.  You can answer, Mr.
16  Patel.
17         THE WITNESS:  That's
18  correct.
19    BY MR. GREEN:
20    Q.  Okay.  Let's go to paragraph
21  9 of your declaration.  "Despite" --
22  and I'm reading, "Despite the efforts
23  of me and my team at BCBG and Max
24  Rave, I'm aware of four lawsuits

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 50

1  alleged by legends of FACTA that have
2  been brought against BCBG and Max
3  Rave."
4          Did I read that
5  correctly?
6    A.  You did.
7    Q.  And what efforts did you and
8  your team do?
9          MR. WILSON:  Vague.
10  Vague as to time. Overbroad.
11  Ambiguous.  You can answer.
12          THE WITNESS:  Can you
13  be more specific as to what --
14  BY MR. GREEN:
15    Q.  Sure.  I will repeat it.
16  Despite the efforts of me and my team
17  at BCBG and Max Rave, what efforts
18  are you referring to in that
19  paragraph?
20    A.  We are referring to efforts
21  to make the system compliant with
22  FACTA.
23    Q.  And what specific efforts
24  did you do?

Page 51

1    A.  We looked at the code, we
2  analyzed whether there was anything
3  that we needed to do in order to
4  make it compliant, if there was
5  anything that may be lacking, and
6  instructed our vendors off our point
7  of sale software to modify the code
8  as necessary to make it compliant.
9    Q.  And what is the code?
10    A.  The code is the software
11  that runs on the point of sale
12  registers.
13    Q.  And what does the code do?
14    A.  The code does a lot of
15  things, among them processes a
16  transaction, sale transaction, credit
17  card. It takes a credit card, gets
18  approval from wherever it needs to
19  get approval from, depending on which
20  vendor we use for approval processing,
21  and prints out receipts and so forth.
22    Q.  How did you know that the
23  BCBG stores were not compliant with
24  FACTA?

Page 52

1          MR. WILSON:  Objection.
2  Attorney-client privilege.  Attorney
3  work product.
4          Mr. Patel, you can
5  answer the question, but you should
6  not disclose any confidential
7  communications between you, any member
8  of your team, and any BCBG attorney
9  either in-house or an outside law
10  firm.
11          THE WITNESS:  I'm not
12  aware that it was -- they were or
13  they are not compliant.
14  BY MR. GREEN:
15    Q.  Okay.  When did you become
16  aware of the requirements of FACTA?
17    A.  When I was notified that the
18  certain number of lawsuits were -- or
19  a lawsuit, actually, specifically, a
20  lawsuit was brought to my attention
21  is when I became aware of FACTA at
22  that point, that we needed to do
23  something.
24    Q.  And when you became aware of

Page 53

1  this lawsuit, what did you do?
2          MR. WILSON:  Objection.
3  Vague.  Are you asking Mr. Patel
4  personally what he did --
5          MR. GREEN:  Yes.
6          MR. WILSON:  -- or what
7  BCBG did?
8          MR. GREEN:  Yes.  I
9  want to know what Mr. Patel did.
10          THE WITNESS:  As soon
11  as I was asked -- as soon as I was
12  informed of this, my first reaction
13  was to determine whether the stores
14  that was in question over here may
15  have or may not have been in
16  compliance, so I instructed my point
17  of sale people that work on the point
18  of sale system to go verify and do
19  what's necessary to correct it if
20  there happens to be a violation in
21  there.
22  BY MR. GREEN:
23    Q.  And who are the point of
24  sale people?

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 54

1    A. It was Bill Lucas, it was
2  Steve Suarez, it was Ahamed Nehoray.
3  I think those are the people that
4  come to my mind who I instructed to
5  look into the problem.
6    Q. And when you say "look into
7  the problem," what did you instruct
8  them to do?
9    A. To assess whether in fact
10  what I was told that we may be doing
11  or not doing --
12        MR. WILSON: And just
13  Mr. Patel, you shouldn't disclose any
14  confidential communications between
15  you or any other employees of BCBG
16  and any BCBG attorney. You can
17  answer to the extent your response
18  doesn't disclose such communications
19  because your communications between
20  you and counsel are privileged. But
21  go ahead. I apologize for
22  interrupting. Go ahead.
23        THE WITNESS: Because I
24  discussed these with my attorneys, I

Page 55

1  will choose not to answer that.
2  BY MR. GREEN:
3    Q. So you're refusing to answer
4  that question.
5        MR. WILSON: To the
6  extent the question calls for a
7  confidential communication. If you
8  want to know what actions --
9        MR. GREEN: I'm just
10  asking Mr. Patel, just so I know so
11  the record is clear.
12        MR. WILSON: He is
13  refusing to disclose confidential
14  communications between himself and his
15  attorneys. He'll answer your question
16  but not to the extent --
17        MR. GREEN: Counsel,
18  I'm asking Mr. Patel.
19        MR. WILSON: Counsel,
20  you need to calm down. I'm giving you
21  a lot of leeway here. I'm simply
22  asserting an attorney-client privilege
23  objection. You're trying to make the
24  witness feel bad for not disclosing

Page 56

1  confidential communications. If you
2  want to know what actions were taken,
3  you're free to ask that and Mr. Patel
4  will answer.
5        MR. GREEN: Can you
6  read back my question.
7        (Record read as from
8  page 40, lines 20-21.)
9        MR. GREEN: So we are
10  clear that you're asserting
11  attorney-client privilege with respect
12  to that statement, that question.
13        MR. WILSON: That's
14  absolutely correct. If you want to
15  know what they did or what actions he
16  took, he can answer that; but to the
17  extent the question calls for any
18  confidential communications between
19  either Mr. Patel or any other BCBG or
20  Max Rave employee between any BCBG
21  in-house attorney or outside attorney,
22  the question is invasive of the
23  attorney-client privilege.
24        Now, subject to and

Page 57

1  without waiving that objection, Mr.
2  Patel, you can answer the question.
3        THE WITNESS: I simply
4  instructed my team, people, Steve
5  Suarez and Bill Lucas, to look into
6  the -- when I was instructed that we
7  had a lawsuit filed, of course, the
8  first thing I do is would have asked,
9  A, why is this true, so I instructed
10  him to go and determine that.
11  BY MR. GREEN:
12    Q. And with respect to the
13  actions they took, did they contact
14  individual stores?
15        MR. WILSON: Objection.
16  Vague as to the term "contact."
17  BY MR. GREEN:
18    Q. Did they communicate with --
19  did Bill Lucas or Steve Suarez
20  communicate with any BCBG stores?
21        MR. WILSON: Calls for
22  speculation. Lacks foundation. You
23  can answer if you know.
24        THE WITNESS: I'm not

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 58

1  sure exactly what they did to
2  determine whatever they had to
3  determine. They had to find out
4  whether these allegations were true or
5  not with respect to the lawsuit that
6  was filed. I do not know. So I
7  basically instructed them to go
8  research and find out what was the
9  problem, if there was any.
10  BY MR. GREEN:
11  Q. What does that mean? In
12  other words, what do you mean
13  research the problem? And I will try
14  to be more direct, okay, I will try
15  to be more direct. I'm not trying
16  to be combative and I appreciate
17  this.
18  What steps were taken
19  to find out whether or not certain
20  receipts were complying with FACTA?
21  MR. WILSON: Objection.
22  It's overbroad. It's beyond the
23  scope of this deposition. Counsel,
24  how does that question relate to the

Page 59

1  location of the witnesses?
2  MR. GREEN: This is the
3  question that's on the table and I
4  would like the deponent to answer.
5  MR. WILSON: I would
6  like an offer of proof as to why
7  that --
8  MR. GREEN: I don't
9  have to give you an offer of proof.
10  MR. WILSON: Then I
11  will instruct the witness not to
12  answer in regards that it's far
13  beyond the scope of the 30B6 rule.
14  MR. GREEN: And what is
15  that issue? Here's the question that
16  we have, counsel --
17  MR. WILSON: Calm down.
18  I know you're an experienced attorney.
19  There's no need to get upset.
20  MR. GREEN: I'm not
21  upset.
22  MR. WILSON: I will
23  tell you about Rule 30B6. I don't
24  MR. GREEN: I don't

Page 60

1  need you to do that.
2  MR. WILSON: You just
3  asked me to explain the objection.
4  I'm happy to do that.
5  MR. GREEN: I want to
6  get on track.
7  MR. WILSON: I do too.
8  The reason we're here today is
9  because Mr. Patel has been designated
10  as the person most qualified according
11  to Rule 30B6. He flew out here
12  today to talk about the location of
13  the witnesses, party and nonparty
14  affiliates.
15  Now, we are not going
16  to get in to and open up the scope
17  of this deposition to every issue
18  that's relevant in this case. We
19  don't have time to do that and I'm
20  not going to allow that. Let's keep
21  to what is at issue and what the
22  Court ordered us to talk about, which
23  is the location of the witnesses.
24  We are not going to

Page 61

1  talk about every single thing that
2  BCBG and Max Rave did once they got
3  first notice of these lawsuits. If
4  you want to talk about who did what
5  and where they reside and where they
6  work, let's do that. I'm just trying
7  to move this process along, counsel.
8  MR. GREEN: Finished?
9  MR. WILSON: Yes.
10  MR. GREEN: Thank you.
11  BY MR. GREEN:
12  Q. Back to what my question
13  was, what did Bill Lucas and Steve
14  Suarez do pursuant to your orders?
15  A. I don't know exactly what
16  they did.
17  Q. You don't know. Do you
18  know if they contacted any individuals
19  in Illinois at any BCBG store?
20  A. I don't know that.
21  Q. Did you ever contact any
22  individuals in Illinois at any BCBG
23  store to find out whether or not the
24  stores were complying with FACTA?

DEPOSITION OF AJIT PATEL – November 9, 2007

Page 62

1    A.  I did not.
2    Q.  Did any member of your team
3  or -- start with that. Did any
4  member of your team contact anyone,
5  any BCBG employee in Illinois,
6  regarding the requirements of FACTA?
7            MR. WILSON: Calls for
8  speculation. It's vague and
9  ambiguous. It lacks foundation.
10           THE WITNESS: I don't
11  know exactly what they did.
12    BY MR. GREEN:
13    Q.  Do you know if any of your
14  vendors contacted anyone in Illinois
15  regarding the requirements of FACTA?
16    A.  Same answer. I don't know
17  exactly what they did.
18    Q.  Paragraph 11 of your
19  declaration, "BCBG and Max Rave admit
20  that despite their best efforts and
21  good-faith efforts to bring the
22  machines and all of their stores into
23  compliance with FACTA, they may have
24  on one or more occasions printed the

Page 63

1  expiration date of a credit card."
2            What efforts or
3  good-faith efforts did you employ to
4  bring machines in Illinois into
5  compliance with FACTA?
6            MR. WILSON: Objection.
7  It's beyond the scope of the
8  deposition. It's vague. It's
9  ambiguous.
10           THE WITNESS: I
11  personally did not, personally,
12  personally, I did not; but I had my
13  team do whatever necessary and they'd
14  been instructed to do whatever
15  necessary to make sure that we comply
16  with all the laws. Always.
17    BY MR. GREEN:
18    Q.  What did your team do here
19  in Illinois to comply with the laws?
20    A.  Exactly what they did, I do
21  not know.
22    Q.  So you don't know whether --
23  you don't know if your team spoke to
24  anyone in Illinois, a BCBG employee

Page 64

1  in Illinois, about complying with
2  FACTA.
3            MR. WILSON: Objection.
4  Lacks foundation. It calls for
5  speculation. It's beyond the scope
6  of the Rule 30B6 deposition today.
7            THE WITNESS: No, I
8  don't.
9    BY MR. GREEN:
10    Q.  You don't.
11    A.  No.
12    Q.  Paragraph 13, "In addition,
13  BCBG and Max Rave immediately took
14  various steps to remedy their
15  operations upon receiving notice of
16  the requirements of FACTA."
17            Did I read that
18  correctly, sir?
19    A.  You did.
20    Q.  What steps did BCBG take in
21  Illinois?
22            MR. WILSON: Same
23  objections. Beyond the scope of the
24  Rule 30B6 deposition. The question

Page 65

1  has nothing to do with the location
2  of the witnesses.
3            MR. GREEN: It has
4  everything to do, counsel. What steps
5  did they take in Illinois? What
6  individuals did they contact? And so
7  far I hear nothing.
8            MR. WILSON: If you ask
9  Mr. Patel whether he's aware of any
10  witnesses who did anything in
11  Illinois, I think the question does
12  relate to the scope of the deposition
13  and why we're here today; but if
14  you're simply asking what was done in
15  Illinois, the question is vague and
16  ambiguous because are you asking --
17            MR. GREEN: I'm not
18  going to argue this, counsel.
19            MR. WILSON: Well, I'm
20  just trying to clarify the objection
21  and streamline things here.
22            MR. GREEN: You're
23  doing more talking than he is here.
24  I don't know if you're getting paid

Page 66

1   by the word. I just would like to
2   get through this.
3      BY MR. GREEN:
4      Q. We will go this route. Mr.
5   Patel, what individuals did your team
6   speak with in Illinois regarding
7   compliance with FACTA?
8      A. As I said, exactly what they
9   spoke, I don't know because I wasn't
10  there.
11     Q. I understand. Who?
12        MR. WILSON: Counsel,
13  calm down. Your tone is getting very
14  argumentative. Try and maintain your
15  composure.
16        THE WITNESS: Who they
17  spoke to -- I will assume they will
18  have spoken to, assume they spoke to
19  a store manager possibly or an
20  assistant manager possibly.
21     BY MR. GREEN:
22     Q. But you don't know the names
23  of --
24     A. I don't know the names.

Page 67

1         MR. WILSON: Move to
2   strike as speculation. Lacks
3   foundation.
4         THE WITNESS: No.
5         MR. GREEN: Can I
6   finish the question or no?
7         MR. WILSON: Counsel,
8   I'm just preserving a record here.
9         MR. GREEN: I
10  understand, but can you let me finish
11  the question?
12        MR. WILSON: Of course.
13  I didn't mean to interrupt you.
14        MR. GREEN: Okay.
15     BY MR. GREEN:
16     Q. Same question. What did Max
17  Rave -- what, to your knowledge, did
18  Max Rave -- what individuals in
19  Illinois did Max Rave contact in
20  order that their stores comply with
21  FACTA?
22        MR. WILSON: Same
23  objections.
24        THE WITNESS: I'm not

Page 68

1   sure what exactly Max Rave, IT
2   director, did or did not do
3   specifically because a store, I
4   believe, in question was a BCBG
5   store. I don't know exactly what Sam
6   Busceti may have done.
7         He may have spoken
8   with, again, store manager or the
9   store assistant manager or he may
10  have used our ability to remotely
11  look at the systems and determine
12  what or what was not being done at
13  the receipt level in that particular
14  store.
15     Q. So you are not in charge or
16  you have -- you were not responsible
17  for the information technology of Max
18  Rave.
19     A. I am totally and always have
20  been responsible. I instruct my
21  people. I don't program. I don't
22  write code. I don't do any of that
23  right now. I have far broader
24  responsibilities, but I am also very

Page 69

1   specific to make sure that we, A,
2   comply with the law, that B, our
3   systems functioned accurately as they
4   are supposed to.
5      Q. Okay. I don't understand
6   your answer. So I just want to ask
7   -- and it's not because -- I'm sure
8   you were doing your best to make it
9   clear to me and it's my fault.
10        I just am trying to
11  understand that, from what you said,
12  it's Steve Busceti, is that his name?
13     A. Steve Busceti.
14     Q. Busceti is in charge --
15     A. Sam Busceti. I'm sorry.
16     Q. Sam Busceti is in charge of
17  information technology for Max Rave
18  and you are not directly responsible
19  for that?
20        MR. WILSON: Misstates
21  prior testimony.
22        THE WITNESS: I am
23  directly responsible. Just equally as
24  I am responsible for the BCBG store

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 70

1  systems.
2    BY MR. GREEN:
3    Q.  Okay.  Could we jump to
4  paragraph 15.  "Nearly all of the
5  BCBG and Max Rave employees who would
6  be required to introduce this evidence
7  currently work and live in
8  California."  You're saying nearly
9  all.
10          What other BCBG
11  employees that you know do not work
12  and live in California that would be
13  -- that would have evidence relevant
14  to this lawsuit?
15    A.  Sam Busceti being one, and
16  any store operations people in his
17  organization, meaning Max Rave store
18  operations not directly reporting to
19  me, may have information related to
20  this.
21    Q.  How about with respect to
22  BCBG?
23    A.  With respect to BCBG, our
24  store operations people, the regional

Page 71

1  managers, would be aware of this. The
2  store people who -- store operations
3  people at our headquarters, there are
4  numerous of them, that in fact are
5  the ones that work with all the
6  stores to instruct them to do
7  whatever we require them to do out of
8  our headquarters.
9    Q.  Could I draw your attention
10  to footnote 1 on that same page.  It
11  says there are third-party vendors.
12  You may have identified them but I
13  just want to be clear.  What
14  third-party vendors are you referring
15  to?
16    A.  First, NSB, and second,
17  Triversity.
18    Q.  And those are the only
19  third-party vendors.
20          MR. WILSON:  That he's
21  referring to in footnote 1?
22          MR. GREEN:  Beg your
23  pardon.  Yes.  I'm sorry.
24          THE WITNESS:  There may

Page 72

1  have been another party through a
2  company called Red Iron.
3    BY MR. GREEN:
4    Q.  Two words, Red Iron?
5    A.  Red Iron.
6    Q.  And do you know where
7  they're located?
8    A.  They are located in -- you
9  know what?  I think they're located
10  somewhere in Canada.  I'm not sure
11  where.
12    Q.  Would any of these
13  third-party vendors be involved --
14  would any of these third-party vendors
15  have communication with individuals
16  associated with BCBG in Illinois?
17    A.  I don't think so.
18    Q.  But you're not sure.
19    A.  I'm not sure.
20    Q.  Paragraph 16, and again, I
21  apologize.  You mentioned Sam Busceti,
22  and I'm just trying to look at my
23  notes.  He is a New York/New Jersey
24  resident.

Page 73

1          And what knowledge and
2  information regarding BCBG does he
3  have according to your paragraph 16?
4  What did you mean by that?
5    A.  He is one of the directors.
6  He also has knowledge of the
7  Triversity application which runs on
8  all our point of sale terminals on
9  both BCBG as well as on the Max Rave
10  systems.  So he has intricate
11  knowledge of the systems.
12    Q.  And turning to page 5, Brian
13  Fleming, what knowledge and
14  information regarding operations in
15  transactions would he have?
16    A.  As Chief Financial Officer
17  of the company, he would obviously
18  have had to be involved, in my
19  opinion, to do with anything that
20  happens which impacts the company's
21  finances.
22    Q.  Would he have had any
23  contact with any individuals in
24  Illinois regarding BCBG's compliance

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 74

1   with FACTA?
2           MR. WILSON: Calls for
3   speculation. Lacks foundation.
4           THE WITNESS: I don't
5   know.
6   BY MR. GREEN:
7       Q. Billie Parsons, what
8   information -- excuse me. As vice
9   president of finance in BCBG, what
10  information would Billie Parsons have
11  respective to compliance with FACTA?
12      A. Exactly the same as Mr.
13  Fleming. Being a vice president of
14  finance, she would have to be
15  involved with any efforts through our
16  retail operations.
17      Q. Paragraph 17 you name Visa
18  which says "is located in Foster
19  City, California." You also mentioned
20  earlier that Master Card is also
21  accepted by BCBG stores. Do you know
22  where Master Card is located?
23      A. I don't know where their
24  headquarters are.

Page 75

1       Q. You mentioned earlier that
2   American Express is also a credit
3   card that's accepted by BCBG.
4           Do you know where they
5   are located?
6       A. Their credit card
7   operations, as I might know from the
8   past, I'm not sure if they are still
9   there, but was Phoenix, Arizona.
10      Q. And you mentioned -- are you
11  aware of either Visa, Master Card, or
12  American Express communicating with
13  any individuals -- any BCBG employees
14  in Illinois with respect to compliance
15  with FACTA?
16      A. No, I'm not aware of
17  anything.
18      Q. You indicate in paragraph 17
19  Russell Bauers. Do you know where
20  Russell Bauers lives?
21      A. Yes. He lives in Los
22  Angeles.
23      Q. And what information
24  regarding BCBG does he have knowledge?

Page 76

1       A. Russell Bauers was our
2   comptroller for retail operations,
3   retail finance operations. So he
4   would be very intricately involved in
5   this. If there were any
6   communications, he would have been the
7   first one to have been communicated
8   to.
9       Q. Paragraph 18 it states,
10  "Because the allegations in these
11  lawsuits relate to credit card and
12  debit card processing and transaction,
13  the plaintiffs in the Hile, Bathon,
14  Gueorguiev and Dudzienski lawsuits may
15  want to conduct inspections of
16  documents and evidence related to BCBG
17  and Max Rave's operations, records and
18  procedures. All such evidence that
19  that is potentially related to the
20  allegations in Hile, Bathon,
21  Gueorguiev and Dudzienski lawsuits are
22  located in California, including all
23  documents."
24          What operations,

Page 77

1   according to paragraph 18, are in
2   California?
3       A. All. Pretty much all
4   operations --
5       Q. Sorry. I will let you
6   finish.
7       A. All operations are in
8   California, which means we are talking
9   about all their -- the store
10  operations people, the store
11  allocations people, merchandise
12  planning operations, financial
13  operations. All of those are located
14  in Los Angeles, California.
15      Q. Are any operations located
16  in Illinois? Excuse me. Are any
17  operations located in Illinois?
18      A. No.
19      Q. What records are located in
20  California?
21      A. Every record basically of
22  the company. Any store with respect
23  to all of the records are located in
24  California.

DEPOSITION OF AJIT PATEL – November 9, 2007

Page 78

1    Q.  Do you know if there are
2    any records that are located in
3    Illinois?
4    A.  Repeat that, please.
5    Q.  Yes.  Can you tell me what
6    records are located in Illinois?
7         MR. WILSON:  Objection.
8    Assumes facts not in evidence.  Lacks
9    foundation.
10        THE WITNESS:  I'm not
11   sure if there's anything that -- any
12   records that are resident in Illinois.
13   BY MR. GREEN:
14   Q.  What procedures are in
15   California?
16   A.  Be more specific.  What
17   procedures?
18   Q.  What do you mean by
19   "procedures" in paragraph 18?
20   A.  Oh, okay.  You shifted on
21   me a little too quickly.
22   Q.  I'm sorry.
23   A.  All procedures are in
24   California basically to do with

Page 79

1    anything to do with store operations,
2    store communications, store
3    coordinations.  Any communications
4    that goes back and forth.  Financial
5    procedures, all of them are located
6    in California.
7    Q.  Are there any procedures
8    that would be located here in
9    Illinois?
10   A.  Not that I know of.
11   Q.  All right.  Do you know
12   what Ambiron Trustwave is, sir?
13   Ambiron Trustwave. A-M-B-I-R-O-N,
14   Trustwave.
15   A.  I'm sorry, I don't.
16   Q.  Let me just look over my
17   notes.  Paragraph 14, last sentence,
18   sir.  "I anticipate that Hile,
19   Bathon, Gueorguiev and Dudzienski will
20   involve many of the same facts,
21   witnesses, documents, software
22   programs, machines and other
23   evidence."
24        What are the same facts

Page 80

1    that would be involved in those
2    cases?
3         MR. WILSON:  Objection.
4    Overbroad.  It lacks foundation.
5    Calls for a legal conclusion.  You
6    can answer very generally, Mr. Patel,
7    to the extent that you understand the
8    question.
9         THE WITNESS:  Every
10   machine is exactly the same,
11   basically, or pretty similar, so I
12   would assume that everything related
13   to this particular case, all of them
14   being the same, all of those things
15   are similar or the same things.
16   BY MR. GREEN:
17   Q.  What do you mean by
18   "machines"?
19   A.  The back office machines
20   where we process all the credit card
21   transactions and/or transactions in
22   the back office.
23   Q.  What witnesses are involved
24   in those four cases that are the

Page 81

1    same?
2         MR. WILSON:  Asked and
3    answered.
4    BY MR. GREEN:
5    Q.  You could answer.
6    A.  Just about everybody that
7    would be involved in one would be
8    involved in the other because they
9    were all part of this effort.
10   Q.  What documents are the same
11   in all these cases?
12   A.  Same.  All the documents
13   that are associated, one and all are
14   located in California, whether it's
15   BCBG or Max, all located in
16   California.
17   Q.  What software programs are
18   the same in all these cases?
19   A.  The point of sale software
20   is the same as well as the back
21   office software and the credit card
22   processing software for approval, all
23   of those are the same.
24   Q.  And they're all located in

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 82

1   California?
2       A.   The software in the
3   machines, hardware, everything located
4   in California.
5       Q.   And there's no software or
6   hardware machines located in Illinois?
7           MR. WILSON:  Vague and
8   ambiguous.
9           THE WITNESS:  Other
10  than the point of sale system, yes.
11          MR. GREEN:  I don't
12  have any other questions.
13          MR. WILSON:  I don't
14  know the local procedure, whether you
15  -- in the Northern District of
16  Illinois, whether you stipulate to
17  remove the deposition officer for
18  duties and obligations under the
19  Federal Rules.  If there is such a
20  procedure, if you want to propose it,
21  we can do that.
22          MR. GREEN:  In other
23  words --
24          MR. WILSON:  If you

Page 83

1   like, I can try and propose what kind
2   of comstom we have in California.
3           MR. GREEN:  It's your
4   client.  I wouldn't want to stipulate
5   -- let's do the usual stipulation, so
6   I'm not sure how you want to --
7           MR. WILSON:  Okay.
8           MR. GREEN:  I know that
9   you'll have an opportunity to review
10  your transcript.  The changes that
11  you -- in other words, if there are
12  some changes, you can make and review
13  the transcript prior to signing it or
14  you can waive the signature, and
15  that's up to you.  Some of the changes
16  that would be made are slight.  You
17  couldn't, for instance, change a yes
18  to a no, but you can make those and
19  you can review that prior to or you
20  can waive your signature.
21          MR. WILSON:  Why don't
22  we take a quick break.
23          MR. GREEN:  Sure.
24          MR. WILSON:  I might do

Page 84

1   a little bit of a very brief
2   examination.  And you may have some
3   followup questions following my very
4   brief examination.  Because I want to
5   make sure that this is both of the
6   parties' opportunity to advise the
7   Court of the kind of global universe
8   of who we anticipate to be the
9   witnesses in these cases and the
10  location of those witnesses.
11          So I think there was
12  some -- there are some persons that
13  have not been talked about that we
14  should probably briefly address, so I
15  will -- we will go forward with a
16  brief examination and let you come
17  back with some Cross.
18          MR. GREEN:  Sure.
19          MR. WILSON:  Why don't
20  we take a quick break and go off the
21  record if that's okay with you,
22  counselor.
23          MR. GREEN:  That's
24  fine.

Page 85

1           (Off the record.)
2           MR. WILSON:  Why don't
3   we go back on the record.
4   EXAMINATION
5   BY MR. WILSON:
6       Q.   Mr. Patel, as you know, my
7   name is Scot Wilson.  I'm an attorney
8   at Call, Jensen & Farrell, counsel in
9   this case for defendants, BCBG, Max
10  Azria Group, Incorporated, BCBG Max
11  Azria Holdings, Incorporated and BCBG
12  Max Azria International Holdings,
13  Incorporated.
14          Mr. Patel, who is
15  Robert Oleesky, O-L-E-E-K-S-I?
16          THE WITNESS:  S-K-Y.
17          Robert Oleesky is my
18  predecessor at BCBG.  He was a Chief
19  Technology Officer prior to my coming
20  on board and remained up with the
21  company through the year 2006.
22      Q.   When you refer to BCBG, are
23  you refer to BCBG Max Azria Group,
24  Incorporated?

Page 86

1    A. Yes, I am.
2    Q. Is it your testimony that
3  Mr. Oleesky is no longer an employee
4  of BCBG Max Azria Group, Incorporated?
5    A. That is correct.
6    Q. And what was the approximate
7  date that Mr. Oleesky's employment
8  with BCBG Max Azria Group,
9  Incorporated ended, to your knowledge?
10   A. I believe it was early this
11  year.
12   Q. Earlier in 2007?
13   A. 2007. Early in 2007, yes.
14   Q. Do you know if Mr. Oleesky
15  -- strike that.
16      Do you know where Mr.
17  Oleesky lives?
18   A. Yes. He lives in Los
19  Angeles.
20   Q. Did Mr. Oleesky work out of
21  BCBG Max Azria Group, Incorporated's
22  headquarters in Vernon, California?
23   A. Yes, he did.
24   Q. I believe you previously

Page 87

1  testified that there was an individual
2  by the name of Steve Suarez who used
3  to work at BCBG Max Azria Group as a
4  store systems manager; is that
5  correct?
6    A. That is correct.
7    Q. Do you know when Mr. Suarez
8  left BCBG Max Azria Group?
9    A. I believe he left around
10  March, April timeframe, I think.
11   Q. April of 2007?
12   A. 2007.
13   Q. And do you know if Mr.
14  Suarez has taken a new position at
15  any company?
16   A. Yes. He is employed by
17  another company.
18   Q. Do you know where the
19  company that Mr. Suarez now works at
20  is located?
21   A. In Los Angeles.
22   Q. How about Bill Lucas? I
23  believe you testified previously that
24  Mr. Lucas previously worked as a

Page 88

1  retail systems manager at BCBG Max
2  Azria Group, Incorporated in Vernon,
3  California; is that right?
4    A. That is right.
5    Q. When did Bill Lucas stop
6  working at BCBG Max Azria Group,
7  Incorporated?
8    A. It was approximately May
9  timeframe.
10   Q. Do you know if Mr. Lucas
11  still lives in Los Angeles?
12   A. He lives in Los Angeles.
13   Q. Do you know if Mr. Lucas
14  has taken a position with any other
15  company since his employment at BCBG
16  Max Azria Group, Incorporated ceased?
17   A. Yes. He is working with a
18  company in Los Angeles.
19   Q. How about Russell Bauers? I
20  believe you previously testified that
21  Mr. Bauers was involved as a retail
22  comptroller or a similar type position
23  at BCBG Max Azria Group but no longer
24  works for the company.

Page 89

1    A. That is correct.
2    Q. Do you know if Mr. Bauers
3  has taken a position with a new
4  employer since his employment at BCBG
5  Max Azria Group, Incorporated ceased?
6    A. Yes, he has taken on another
7  job.
8    Q. Do you know where that job
9  is located, Mr. Bauers' current
10  employment?
11   A. It is in downtown Los
12  Angeles.
13   Q. With respect to Joe
14  Hasenzahl, who I believe you
15  previously testified was the director
16  of retail systems at BCBG Max Azria
17  Group, Incorporated, Mr. Hasenzahl is
18  also a former employee; is that
19  correct?
20   A. That is correct.
21   Q. Do you know if Mr. Hasenzahl
22  -- strike that.
23      Do you know when Mr.
24  Hasenzahl stopped working at BCBG Max

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 90

1    Azria Group?
2      A.  I believe that was around
3    March timeframe of this year, 2007.
4      Q.  And do you know if Mr.
5    Hasenzahl has taken any other position
6    since leaving BCBG Max Azria Group?
7      A.  Yes, he has.
8      Q.  Do you know the location of
9    Mr. Hasenzahl's current employer?
10     A.  I don't know exactly
11   location of but I know he's in Los
12   Angeles.
13     Q.  Do you believe that --
14   strike that.
15         If this case were to
16   proceed to trial in Illinois, do you
17   believe that Mr. Olecsky would
18   voluntarily appear and testify as a
19   witness in this case?
20     A.  No.
21     Q.  Why?
22     A.  Because of the situation
23   under which he left.
24     Q.  Do you believe that if this

Page 91

1    case were to proceed to trial in
2    Illinois, Mr. Suarez would voluntarily
3    appear as a witness at trial in this
4    case?
5      A.  No.
6      Q.  Why?
7      A.  Because of the work
8    requirements, his position, I don't
9    think, would allow him to leave
10   California for any period of time.
11     Q.  The work situation with Mr.
12   Suarez' current employer?
13     A.  Yes.
14     Q.  If this case were to proceed
15   to trial in Illinois, do you believe
16   that Mr. Lucas would voluntarily
17   appear to testify as a witness?
18     A.  I don't believe he will
19   either.
20     Q.  Why?
21     A.  I believe the same
22   situation, because of his work
23   obligations.
24     Q.  With respect to Mr. Bauers,

Page 92

1    if this case were to proceed to trial
2    in Illinois, do you believe that Mr.
3    Bauers would voluntarily appear at
4    trial to testify as a witness?
5      A.  I don't believe he would
6    either.
7      Q.  And why do you believe that
8    Mr. Bauers would not travel to
9    Illinois to voluntarily appear and
10   testify as a witness in this case if
11   the case were to proceed in Illinois?
12     A.  Again, the same situation.
13   Time obligations with work.
14     Q.  Do you believe that Joe
15   Hasenzahl would voluntarily appear to
16   testify as a witness at trial in this
17   case if this case were to proceed in
18   Illinois?
19     A.  I don't think so either.
20     Q.  Why not?
21     A.  It's the same situation
22   again.  It's the time obligation with
23   his work.
24         MR. WILSON:  I don't

Page 93

1    have any further questions.
2          Counsel, do you have
3    any followup?
4          MR. GREEN:  No.
5          MR. WILSON:  Going back
6    to your stipulation, counsel, I will
7    give one a crack if you want.  I
8    propose that we relieve the deposition
9    officer of her duties and obligations
10   under the Federal Rules of Civil
11   Procedure; that the original
12   deposition transcript be provided to
13   counsel for defendants.  Upon our
14   receipt of the original deposition
15   transcript, we will forward it to Mr.
16   Patel.  He'll have 35 days --
17   counsel, is that okay?
18         MR. GREEN:  I'm sorry?
19         MR. WILSON:  No.
20   That's fine.
21         MR. GREEN:  I'm more of
22   a State -- I should know that.
23         MR. WILSON:  -- 35 days
24   upon receipt by our office of the

DEPOSITION OF AJIT PATEL - November 9, 2007

Page 94

1   original deposition transcript for Mr.
2   Patel to review the deposition
3   transcript and make any changes or
4   corrections that he deems necessary
5   with the understanding that such
6   corrections can, and likely may, be
7   commented upon for any purposes at
8   trial or otherwise.
9            In the event the
10  original deposition transcript is
11  lost, destroyed, or otherwise
12  unavailable at the time of trial or
13  any other time for which it may be
14  required by order of the Court, a
15  true and correct copy -- a certified
16  copy may be used in lieu of the
17  original.
18           As the party retaining
19  the original deposition transcript,
20  our office will have the
21  responsibility of lodging the original
22  deposition with the Court at the
23  appropriate time.
24           Aside from that, just

Page 95

1   to let you know, counsel, given the
2   kind of unique nature of this
3   deposition, we have asked the court
4   reporter to get an expedited
5   transcript of the deposition so that
6   hopefully by the time of the hearing
7   on the 15th we can provide the Court
8   with a copy of the deposition
9   transcript so that we are in a
10  position where we can point to
11  specific testimonies as opposed to
12  characterizing the actual testimony
13  for purposes of our arguments,
14  obviously.
15           So with that, that's
16  the stipulation.  Do you agree?
17           MR. GREEN: I agree.
18           MR. WILSON: So
19  stipulated.
20           FURTHER DEPONENT SAITH
21  NOT

Page 96

1            KARIN DUDZIENSKI VS
2        BCBG MAX AZRIA GROUP, et al.
3        The Deposition of AJIT PATEL,
4   taken in the matter, on the date, and
5   at the time and place set out on the
6   title page hereof.
7        It was requested that the
8   deposition be taken by the reporter
9   and that same be reduced to
10  typewritten form.
11       It was agreed by and between
12  counsel and the parties that the
13  Deponent will read and sign the
14  transcript of said deposition.
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .

Page 97

1   .            CERTIFICATE
2   STATE OF        :
3   COUNTY OF       :
4        Before me, this day,
5   personally appeared, AJIT PATEL, who,
6   being duly sworn, states that the
7   foregoing transcript of his/her
8   Deposition, taken in the matter, on
9   the date, and at the time and place
10  set out on the title page hereof,
11  constitutes a true and accurate
12  transcript of said deposition.
13           .
14           AJIT PATEL
15  .
16    SUBSCRIBED and SWORN to before me
17  this    day of        ,
18  _____ in the jurisdiction aforesaid.
19
20  My Commission Expires  Notary Public
21  .
22  .
23  .
24  .

DEPOSITION OF AJIT PATEL – November 9, 2007

| | Page 98 |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | . |
| 3 | RE:    M & M REPORTING, INC. |
| 4 | File No.    34855 |
| 5 | Case Caption: KARIN DUDZIENSKI VS |
| 6 | BCBG MAX AZRIA GROUP, et al. |
| 7 | DEPONENT:    AJIT PATEL |
| 8 | DEPOSITION DATE: NOVEMBER 9, 2007 |
| 9 | . |
| 10 | To the Reporter: |
| 11 | I have read the entire transcript of |
| 12 | my Deposition taken in the captioned |
| 13 | matter or the same has been read to |
| 14 | me.  I request that the following |
| 15 | changes be entered upon the record |
| 16 | for the reasons indicated.  I have |
| 17 | signed my name to the Errata Sheet |
| 18 | and the appropriate Certificate and |
| 19 | authorize you to attach both to the |
| 20 | original transcript. |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | |

| | Page 100 |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | WITNESS          EXAMINATION |
| 3 | |
| 4 | AJIT PATEL |
| 5 | EX-BY MR. GREEN          3 |
| 6 | EX-BY MR. WILSON          85 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 99 |
|---|---|
| 1 | _____ |
| 2 | _____ |
| 3 | _____ |
| 4 | _____ |
| 5 | _____ |
| 6 | _____ |
| 7 | _____ |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | . |
| 23 | SIGNATURE:_____DATE:_____ |
| 24 | AJIT PATEL |

| | Page 101 |
|---|---|
| 1 | OBJECTION INDEX |
| 2 | OBJECTION MADE BY          PAGE |
| 3 | |
| 4 | MR. WILSON          11 |
| 5 | MR. WILSON          17 |
| 6 | MR. WILSON          18 |
| 7 | MR. WILSON          20 |
| 8 | MR. WILSON          22 |
| 9 | MR. WILSON          23 |
| 10 | MR. WILSON          26 |
| 11 | MR. WILSON          27 |
| 12 | MR. WILSON          28 |
| 13 | MR. WILSON          30 |
| 14 | MR. WILSON          31 |
| 15 | MR. WILSON          44 |
| 16 | MR. WILSON          45 |
| 17 | MR. WILSON          46 |
| 18 | MR. WILSON          52 |
| 19 | MR. WILSON          53 |
| 20 | MR. WILSON          57 |
| 21 | MR. WILSON          58 |
| 22 | MR. WILSON          63 |
| 23 | MR. WILSON          64 |
| 24 | MR. WILSON          67 |

6b1ab0eb-14f9-4001-bea1-eb319b8be324

DEPOSITION OF AJIT PATEL - November 9, 2007

```
                                    Page 102
 1            OBJECTION INDEX CONTINUED
 2   OBJECTION MADE BY        PAGE
 3
 4   MR. WILSON               78
 5   MR. WILSON               80
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                    Page 103
 1             EXHIBIT INDEX
 2   NUMBER              MARKED FOR ID
 3
 4   PLT 1               23
 5   EXHIBITS MARKED AND ATTACHED
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24      * * *
```

6b1ab0eb-14f9-4001-bea1-eb319b8be324